IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    v.<br><br>LI PEI TAN,<br>    a/k/a "Peter Tan,"<br>    a/k/a "Lipei Tan,"<br>    a/k/a "Pei Tan,"<br>    a/k/a "Benny Tan,"<br>    a/k/a "Benny,"<br>    a/k/a "Ben Li,"<br>    a/k/a "Ben,"<br>    a/k/a "B,"<br>    a/k/a "Peter,"<br>    a/k/a "P,"<br><br>    *Defendant.* | 1:24-MJ-180 |

**EMERGENCY MOTION FOR STAY AND APPEAL OF MAGISTRATE JUDGE'S ORDER OF RELEASE**

Pursuant to 18 U.S.C. § 3145(a)(1), the United States files this Emergency Motion for a Stay and Appeal of the release order issued by a United States Magistrate Judge in the Northern District of Georgia. In support of this motion, the United States submits the following:

1. This case is an international money laundering case. As set forth in the criminal complaint affidavit, the defendant, **LI PEI TAN**, worked with co-conspirators throughout the United States and the People's Republic of China to arrange for the pickup of bulk proceeds generated by the sale of illegal narcotics in the United States and the subsequent laundering of those proceeds back to drug traffickers through a sophisticated trade-based money laundering scheme. Although, law enforcement has seized approximately $197,770 in drug proceeds from the

1

defendant, additional evidence obtained throughout this investigation reflects that the defendant and his co-conspirators are responsible for laundering millions of dollars of proceeds.

2. On May 8, 2024, the Honorable William E. Fitzpatrick, United States Magistrate Judge for the Eastern District of Virginia, issued a sealed arrest warrant for the defendant based on a complaint filed in the Eastern District of Virginia charging the defendant with conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i).

3. On May 22, 2024, the defendant was arrested at a residence in Buford, Georgia, pursuant to the above-referenced arrest warrant. Agents also executed federal search warrants at several properties associated with the defendant.

4. Later that day, the defendant appeared with appointed counsel for an initial appearance in Case No. 1:24-MJ-462 in the Northern District of Georgia. After the government requested a detention hearing, the Honorable Russel G. Vineyard, United States Magistrate Judge for the Northern District of Georgia, set such a hearing for Tuesday, May 28, 2024, at 1:30 p.m. That same day, attorney Joe S. Habachy filed a Notice of Appearance for the defendant. Due to counsel's unavailability, the detention hearing was reset for May 30, 2024, at 1:30 p.m.

5. Following the detention hearing, the Magistrate Judge ordered the defendant released pending trial on conditions, including a secured $250,000 bond and travel restrictions. *See* Exh. A. At the government's request, the Magistrate Judge stayed the release decision until 4 p.m. on Friday, May 31, 2024, to allow the government to appeal to this Honorable Court. *See* Exh. B.

6. The United States respectfully appeals to this Honorable Court, as the court of original jurisdiction over the offense, and urges the Court to stay the Magistrate Court's release order and reverse the order releasing the defendant on conditions.

## REVIEW OF DETENTION BY THE DISTRICT COURT AND LAW APPLICABLE TO DETENTION

7. The Bail Reform Act, 18 U.S.C. § 3145(a)(1), provides that a court with "original jurisdiction over the offense" may review a magistrate judge's release order. Review is *de novo*, with the court making its findings based either on evidence presented to the magistrate judge or on additional evidence adduced before the district judge. *See United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989); *see also United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985).

8. In determining whether there are adequate conditions of release, the Court is required to consider "the nature and circumstances of the offense charged," "the weight of evidence against" the defendant, "the history and characteristics" of the defendant, and "the nature and seriousness of the danger to any person or the community" posed by the defendant. 18 U.S.C. § 3142(g).

## FACTUAL BACKGROUND

9. As outlined in the criminal complaint affidavit, attached hereto as Exhibit C, the investigation revealed that the defendant conspired with others to launder bulk proceeds generated by the sale of illegal narcotics in the United States through a sophisticated trade-based money laundering scheme.

*March 2024 Traffic Stop & Seizure of $197,770 from the Defendant*

10. In March 2024, the defendant was encountered by Sheriff's deputies with the Anderson County, South Carolina, Sheriff's Office during a traffic stop.

11. Upon questioning, the defendant stated that he had been traveling from Charlotte, North Carolina. The defendant denied consent for the deputies to search his vehicle. Deputies then deployed a K-9 unit which resulted in a positive alert for the odor of narcotics. The defendant then admitted to the deputies that he had cash in the vehicle. Based on the positive alert by the K-9 unit

3

and the defendant's self-admission, the deputies searched the vehicle and located $197,770 in bulk U.S. currency in the rear seat as well as two (2) cellphones and a laptop.

12. Following the discovery of the funds, the defendant agreed to waive his *Miranda* rights and speak with the deputies. The defendant explained that he had traveled to Pittsburgh to pick up currency but that the pickup was ultimately canceled so he drove back to Georgia. While en-route to Georgia, the defendant stated that he was asked to pick up bulk currency in Charlotte. The defendant further stated that he regularly transported money and that the money did not belong to him.

13. During the defendant's interview, he provided consent to search the devices recovered from his vehicle during the traffic stop. On one of the devices, a deputy located a WhatsApp message conversation between the defendant and a co-conspirator ("CC-1") on or about March 3, 2024, in which they coordinated a meeting in Charlotte.

14. When asked about the messages, the defendant explained that CC-1 was the individual he had met with in Charlotte who had given him the currency seized during the traffic stop. Following this interview, the defendant was released.

15. On or about February 29, 2024, in a separate federal investigation in Charlotte, investigators conducted an undercover purchase of approximately three (3) ounces of suspected fentanyl from CC-1. To arrange the deal, an undercover law enforcement officer ("UC") communicated over WhatsApp with a source of supply who was using a Mexican telephone number and arranged to purchase fentanyl. When the UC arrived at the pre-determined meeting location that day, the UC was told he/she would be meeting with a female in a Kia vehicle. After arriving, the UC observed a Kia vehicle being driven by CC-1 and entered the front passenger seat of CC-1's vehicle where the transaction occurred. During the transaction, the UC observed a black

handgun between the driver's seat and the center console of the vehicle. The UC positively identified CC-1 as the person he/she had met with. The suspected fentanyl purchased from CC-1 has been submitted for laboratory analysis.

16. Review of the devices seized from TAN during the traffic stop discovered numerous conversations between the defendant and co-conspirators regarding extensive money laundering activities.

17. For example, investigators located a text message conversation between the defendant and another co-conspirator ("CC-2") regarding the pickup of currency. On or about October 16, 2023, the defendant and CC-2 discussed picking up bulk currency in Virginia. Specifically, CC-2 asked the defendant about "the ones for Virginia" and, in response, the defendant provided two apparent U.S. currency serial numbers. CC-2 and the defendant also discussed money pickups in Baltimore, Maryland, and Delaware.

18. Investigators also located messages between the defendant and co-conspirators in which they frequently exchanged apparent U.S. currency serial numbers, provided the amounts of currency being exchanged, and coordinated where and when to meet to transfer currency.

*Arrest and Interview of the Defendant*

19. On May 22, 2024, the defendant was arrested at a residence in Buford, Georgia, pursuant to the above-referenced arrest warrant. Agents also executed federal search warrants at several properties associated with the defendant.

20. The search of the defendant's residence discovered a money counter, a loaded firearm, and a large amount of bulk U.S. currency secreted throughout the residence in bags, containers, clothing, and various other locations.

21. Additionally, the defendant waived his *Miranda* rights and agreed to speak with investigators. In this post-*Miranda* interview, the defendant stated that CC-2 acted "kind of" like his boss and financed the defendant's trips to pick up bulk currency. The defendant explained that he made multiple trips per month for CC-2 and had been working for CC-2 for approximately four (4) years. The defendant admitted to picking up bulk currency for CC-2 in Virginia, Maryland, North Carolina, South Carolina, and Georgia.

22. The defendant was then transported to a different facility where the interview continued. The defendant again agreed to waive his *Miranda* rights. When asked about the individuals whom he had picked up money from, the defendant admitted that he believed these individuals were involved in illegal activity. When asked why he believed this, the defendant stated the money he received often smelled like marijuana and cocaine. He further stated that the smell was "all he needed to know" to know that the money came from illegal sources. When explicitly asked if he believed the money was illegal, he stated "of course." He also stated that at some point, he confronted CC-2 about why the cash smelled like narcotics and that CC-2 responded by telling him that it was normal and expected for the cash to smell that way.

23. Following this interview, the defendant was transported to the Northern District of Georgia for initial appearance.

24. Pretrial Services in the Northern District of Illinois interviewed the defendant and created a Pretrial Services Report. As reflected in that Report, the defendant reported income of $2,000 a month working as a "warehouse manager" for a business called Ali World Group. He claimed no other financial assets. He also reported being born in China and reported travel to China on multiple occasions.

**BASIS FOR DETENTION**

25. The defendant is a flight risk. The nature of the charged offense, the strong penalties at play, the strength of the evidence, and the defendant's history and characteristics all support detention. *See* 18 U.S.C. § 3142(g).

26. First, the nature of the offense charged, conspiracy to launder money, in violation of Title 18, United States Code, Section 1956(h), supports detention. The case arises out of an investigation of a money laundering organization ("MLO") "led by individuals who laundered hundreds of millions of dollars for Mexican drug cartels." Exh. C at ¶ 25. This MLO operates "across multiple countries and continents," to include "China, Hong Kong, Colombia, Panama, Mexico, Guatemala, Belize, Australia, New Zealand, Costa Rica, Ecuador, the United States, and elsewhere." Exh. C at ¶ 26. The defendant provided a critical service to his co-conspirators by traveling to locations throughout the United States to collect and cause the collection of drug proceeds from representatives of drug traffickers and coordinating with individuals overseas, including in China, to arrange for the laundering of these proceeds. Exh. C at ¶¶ 13, 15, 27.

27. The charged crime is serious. The defendant faces a 20-year maximum sentence, giving him a strong incentive to flee. On March 3, 2024, law enforcement seized nearly $200,000 in cash from the defendant. The defendant admitted that he had picked up this cash from CC-1, an individual who, only a few days prior, had sold suspected fentanyl to an undercover law enforcement officer. Exh. C at ¶¶ 63-66. Not only was the defendant allegedly laundering money for drug trafficking organizations that trafficked in fentanyl but, during a court-authorized search of the defendant's residence on May 22, 2024, law enforcement seized, among other things, approximately $30,000 in cash and a firearm and ammunition. Finally, this investigation has identified financial transactions totaling more than $10,000,000 to date, with many transactions corresponding to a specific date and serial number (used as a verification code for the transfer of

cash). Exh. C at ¶ 53. Given the scope of the money laundering conspiracy uncovered to date, the government submits that if the defendant is convicted of the charged offense, his Guidelines range is likely to be significant based on the value of the laundered funds reasonably foreseeable to the defendant. *See* USSG §§ 2S1.1(a)(2), 1B1.3(a)(1)(B).

28. Second, the weight of the evidence in this case supports detention. In addition to the electronic evidence set forth in the complaint tying the defendant the money laundering conspiracy, law enforcement seized nearly $200,000 in cash from the defendant during the traffic stop in South Carolina. The defendant admitted that he had picked up this cash from an individual known to law enforcement as a drug dealer. Moreover, as detailed above, in the defendant's *Mirandized* statement following his arrest in this case on May 22, 2024, he explained that he and CC-2 regularly picked up bulk cash from various individuals across the United States. When asked whether he knew that the cash he picked up was generated by illegal activity, the defendant stated that "of course" he knew that. The defendant stated that the bulk cash he picked up often smelled like illegal narcotics, specifically cocaine or marijuana. He also stated that at some point, he confronted CC-2 about why the cash smelled like narcotics and that CC-2 responded by telling him that it was normal and expected for the cash to smell that way. Despite this, the defendant chose to continue picking up bulk cash for CC-2.

29. Third, the defendant's history and characteristics also support detention. The defendant has a criminal history which includes a sentence of Probation on a Theft by Taking charge in Gwinnett County, Georgia. Further, although the defendant is a naturalized citizen, he was born in China and frequently travels to China. Since 2018, the defendant has traveled to China six times, including, most recently, in April of this year. During the same period, the defendant also made two trips to Canada. During the conspiracy, the defendant communicated with co-

conspirators over WeChat, a Chinese instant messaging, social media, and mobile payment application. Electronic evidence gathered during this investigation shows that the defendant and his co-conspirators conducted financial transactions involving Chinese bank accounts and cryptocurrency wallets. Given the defendant's ties to China, apparent financial resources, including access to foreign bank accounts and cryptocurrency wallets, and significant overseas travel, the government believes that the defendant could easily flee to China, which has no extradition to the United States, and be beyond the reach of the United States and this Honorable Court. *See United States v. Mallory*, 268 F.Supp.3d 854, 864 (E.D.V.A. 2017) (Ellis, J.) (explaining that the lack of an extradition treaty between the United States and China "inhibit[s] the government's ability to extradite [the] defendant should he flee to China").

30.     Finally, the defendant appears to have provided inaccurate information concerning his employment and financial resources to Pretrial Services in the Northern District of Georgia. The defendant reported to Pretrial Services that he earned a $2,000 monthly income from his employment as a "warehouse manager" at Ali World Group. However, the government has obtained corporate filings for Ali World Group from the Georgia Secretary of State that reflect that, as of the company's annual registration filed on March 29, 2024, the defendant is listed as the CEO, Secretary, and CFO of the company. *See* Exh. D. Furthermore, during their search of the defendant's residence on May 22, 2024, law enforcement seized a letter, dated April 9, 2024, from "WestPark Capital" addressed to the defendant, confirming that the defendant opened a new investment account with WestPark Capital and listing his income as between $100,000 and $200,000 and total net worth as between $1,000,001 and $3,000,000, based on information the defendant provided. *See* Exh. E. The defendant's employment, in this letter, based on information the defendant provided to WestPark Capital, is listed as "manager" at ALI WORLD GROUP INC.

The government respectfully submits that the income and employment information the defendant apparently provided to the investment company WestPark Capital to open an investment account is wholly inconsistent with the information the defendant provided to Pretrial Services.

31. Moreover, the government has electronic evidence from the defendant's devices showing that during the charged money laundering conspiracy, the defendant would arrange to have bulk cash delivered to him at the same address he provided to Pretrial Services as the location of Ali World Group in Norcross, Georgia. Law enforcement executed a search warrant at this location on May 22, 2024, and seized, among other items, a money counter, a device known to be used by professional money laundering organizations to receive and count bulk cash.

## CONCLUSION

32. For the reasons stated above, the United States respectfully urges this Honorable Court to stay the release order issued by the United States Magistrate Judge in the Northern District of Georgia. The United States further respectfully requests that the Court order the defendant to be transported to the Eastern District of Virginia for a hearing on this motion.

JESSICA D. ABER
United States Attorney
Eastern District of Virginia

      /s/
Edgardo J. Rodriguez
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that, on May 31, 2024, I filed the foregoing with the Clerk of Court using the CM/ECF system. I also e-mailed a copy of the foregoing to the defendant's counsel, Joe S. Habachy, at habachylaw@gmail.com.

                                        /s/
                                 Edgardo J. Rodriguez
                                 Assistant United States Attorney