<p style="text-align:center; color:red">Exhibit C</p>

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| LI PEI TAN,<br>    a/k/a "Peter Tan,"<br>    a/k/a "Lipei Tan,"<br>    a/k/a "Pei Tan,"<br>    a/k/a "Benny Tan,"<br>    a/k/a "Benny,"<br>    a/k/a "Ben Li,"<br>    a/k/a "Ben,"<br>    a/k/a "B,"<br>    a/k/a "Peter,"<br>    a/k/a "P,"<br><br>        *Defendant*. | Case No. 1:24-MJ-180<br><br>**<u>UNDER SEAL</u>** |

**<u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT</u>**

I, Peter W. Maher, a Special Agent with the United States Drug Enforcement Administration ("DEA"), being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      This Affidavit is submitted in support of a criminal complaint for **LI PEI TAN ("TAN") a/k/a "Peter Tan" a/k/a "Lipei Tan" a/k/a "Pei Tan" a/k/a "Benny Tan" a/k/a "Benny" a/k/a "Ben Li" a/k/a "Ben" a/k/a "B" a/k/a "Peter" a/k/a "P."** Based on the information set forth in this Affidavit, I submit there is probable cause to believe that from at least in or around 2019 to the present, in the Eastern District of Virginia and elsewhere, **TAN** conspired with others known and unknown to launder monetary instruments, in violation of 18 U.S.C. §§

# Exhibit C

1956(h) (Conspiracy to Launder Monetary Instruments) and 1956(a)(1)(B)(i) (Concealment Money Laundering).

      2.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I have been employed as a Special Agent with DEA since approximately April 2016. I am currently assigned to the Special Operations Division ("SOD") – Bilateral Investigations Unit, a group tasked with investigating the world's most substantial drug traffickers, money launderers, arms smugglers, and narco-terrorists.

      3.      Prior to being assigned to SOD, I was assigned to the High Intensity Drug Trafficking Area group of DEA's Memphis, Tennessee, Resident Office. As a DEA Special Agent, I have conducted numerous investigations targeting high-level foreign drug traffickers throughout the world, including corrupt foreign government officials. For the last seven years, I also have conducted a series of global money laundering investigations focused on the laundering of proceeds derived from illicit drug sales through China, Hong Kong, and other locations throughout the Far East.

      4.      Before my employment with DEA, I was a Police Officer with the City of Tulsa, Oklahoma, Police Department for approximately three years. Throughout my career with the Tulsa Police Department, I was assigned to each of the city's three patrol divisions. I also served as an undercover and plainclothes police officer investigating street-level narcotics and human trafficking operations, in addition to other crimes.

      5.      During my employment with DEA, I have conducted and supervised numerous investigations involving unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of narcotics; the laundering of narcotics proceeds, and monetary instruments derived from narcotics activities; and conspiracies associated with narcotics and

# Exhibit C

money laundering offenses. These investigations have involved debriefings of defendants, witnesses, and informants; conducting surveillance; executing search warrants; seizing narcotics and narcotics-related assets; reviewing and analyzing records related to drug trafficking and money laundering; reviewing electronically intercepted conversations; reviewing computerized data and stored electronic communications; and making arrests.

6.      Throughout my career, I have become familiar with the methods employed by narcotics traffickers to smuggle, safeguard, and distribute narcotics, commit extortion and other violent crimes, and to collect and launder proceeds of drug trafficking. I have become familiar with the general modes and operations of criminals undertaking these activities and with the investigative techniques that are useful and effective in investigating organizations involved in drug trafficking and money laundering activities. I also have consulted with other investigators who have extensive training and experience in conducting criminal enterprises and financial investigations that involve money laundering.

7.      Based on this and other investigations, coupled with information from other law enforcement agents, as well as my training and experience, I am aware that:

   a. international drug trafficking is fundamentally based upon logistics, whereby drug traffickers move drugs from areas of high supply and low resale value (such as Mexico) to areas of lower supply and higher resale value (such as the United States and Europe). Once drugs are sold, traffickers need to move large amounts of drug proceeds back to the source countries;

   b. international drug trafficking is lucrative, and drug trafficking organizations ("DTOs") employ a myriad of methods to laundering the proceeds from the

# Exhibit C

sale of drugs. Due to the large quantities of cash that drug traffickers possess from drug transactions, drug traffickers commonly seek to conceal and launder the illicit proceeds of their activity through the use of both illegal and legal business enterprises and also rely upon complex money laundering networks to assist them in this task;

c.  trade-based money laundering is the process of disguising the proceeds of crime and moving value through the use of trade transactions in an attempt to legitimize their illicit origin. As with many money laundering schemes, the first step is to take illicit cash and place that cash in a financial institution. The subsequent purchasing of products allows money launderers to move illicit proceeds across borders without introducing the currency into the banking system in their home country. Trade based money laundering has several functions. First, it allows transnational criminal organizations to move illicit proceeds across international borders and conceal the origin of the illicit funds while minimizing the use of the banking system, thereby avoiding reporting requirements. Second, it also legitimizes the illicit funds in the country where the goods are received and subsequently sold;

d.  international drug trafficking generates large volumes of bulk cash in various foreign currencies which is difficult to convert and/or physically transport covertly. One of the primary methods that international drug traffickers use to convert and move the value of these foreign currencies back to a home or drug-source country is to use money brokers and/or money launderers. For a fee, these individuals specialize in picking up and

4

Exhibit C

placing the bulk cash into the banking system in coordination with other individuals;

e.  depending on the needs of their drug trafficking clients, these money brokers/launderers may sell all or part of the foreign currencies to individuals and businesses in need of these currencies to settle international trade debts or purchase assets and make investments in those currencies. In these instances, drug traffickers receive payment for their proceeds upon the pick-up of the bulk currency in the country where the drugs are sold. For the purposes of this investigation, this is the United States. The money brokers/launderers can also move the value of these drug proceeds through the international financial system at the direction of drug trafficking clients; and

f.  large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. Even though these assets are in names other than the narcotics traffickers', the traffickers own and continue to use these assets and exercise dominion and control over them.

8.    With respect to this investigation and others, I have learned the United States is one of the world's largest and most lucrative markets in which to distribute illegal drugs. The overwhelming majority of the illicit drugs consumed in the United States is produced abroad. The process of transporting drugs from abroad and importing them into the United States is complex

# Exhibit C

and generally involves numerous organizations and individuals. The price of drug continually increases along this supply chain, culminating at the point of sale to users in the United States.

9.      The illegal drug trade generates illicit profits in the United States in the form of U.S. dollars. For this criminal business to continue and achieve its purpose, it is necessary for a portion of this money to be repatriated to the DTOs that manufactured and distributed the narcotics and ultimately brought them into the United States. However, because this money is the proceeds of a "specified unlawful activity," special care and skill has to be taken to transact it to avoid detection by law enforcement.

10.     Simultaneously, there is a demand for U.S. dollars and merchandise around the world, including in the People's Republic of China. There is also a demand for Chinese currency, known as yuan or renminbi ("RMB"), among Latin American merchants, including those in Mexico, seeking to purchase Chinese goods to sell for profit. As a result, individuals with connections to "black market merchants" in China, and foreign, typically Mexican, DTOs and merchants are well-situated to profit by servicing these parallel demands.

11.     Individuals and organizations at the nexus of these needs meet them by receiving drug profits in the United States and: (1) transmitting them in a manner designed to cause an equivalent amount of foreign currency to arrive in bank accounts in China or (2) by using the cash to purchase U.S. goods that are subsequently shipped to China for re-sale. In either case, affirmation that the cash changed hands in the United States from "dealers" to "launderers" triggers the release of payment for the drugs in the location where they are required, often Mexico. For the purposes of this Affidavit, this exchange is known as a "mirror transfer." Once the proceeds are received in China, they are used to finance the purchase of Chinese goods. Merchants in Latin American countries, including Mexico, seek the services of "brokers" capable of obtaining RMB

# Exhibit C

to finance the purchase of Chinese merchandise. Once purchased, this merchandise is shipped to Latin American merchants, including those in Mexico, who sell it for profit through apparently legitimate businesses. The broker is thereby compensated for fronting the payment for the drugs to the drug trafficking organization. This cycle exists to the mutual benefit of all involved.

12.     The individuals responsible for arranging these transactions are compensated on the basis of their success in organizing and executing the transactions and the amount of money involved. It follows that these individuals, along with their co-conspirators, rely on and seek to further the continued success of the illegal drug trade in the United States.

13.     As set forth within this Affidavit, **TAN** provided a critical and essential service to co-conspirators: he transported and coordinated the transport of narcotics proceeds generated by U.S. drug sales to co-conspirators who then laundered those proceeds to the next step in the money laundering process.

14.     The defendant's role aided numerous members of this conspiracy and other money launderers spread throughout the globe. He conspired with individuals in the United States, China, and elsewhere, who conducted financial transactions with proceeds derived from the unlawful sale of controlled substances. The transactions were designed, at least in part, to conceal the nature, location, source, ownership, and control of the proceeds so that they could be provided to individuals and organizations responsible for trafficking illegal drugs into the United States. The conspirators' ultimate goal was to enrich themselves to the greatest extent possible by conducting these transactions.

15.     As set forth in more detail below, the conspiracy included individuals in the United States, including **TAN**, who obtained drug proceeds in the form of cash from representatives of drug traffickers. These individuals would confirm their authorization to collect the drug cash by

Exhibit C

presenting the drug traffickers' representatives with an agreed upon verification code, often a serial number taken from U.S. or foreign currency.

16.     The conspiracy used other secretive and clandestine methods to accomplish its goals. For example:

    a.  it was common for an individual involved in this conspiracy to transport drug proceeds across the United States so they could be further transacted by members of the conspiracy several states removed from where the proceeds were generated;

    b.  the conspirators used encrypted communications platforms to discuss their illegal activities including, but not limited to, cellular telephone applications known as "WeChat" and "WhatsApp";

    c.  the conspirators used bank accounts in the United States, China, and elsewhere to deposit and conduct financial transactions with drug proceeds, including those derived from the sale of cocaine and fentanyl; and

    d.  the conspirators used foreign businesses as well personal and business financial accounts in the United States and abroad to launder and conceal the illicit drug proceeds they received.

17.     The object of the conspiracy was to receive proceeds from the distribution of narcotics, conceal those proceeds from detection, and launder the proceeds for DTOs. The defendant and others sought to facilitate the success of DTOs who imported and distributed drugs in the United States. The conspirators did this by conducting financial transactions with the proceeds derived from the illegal sale of drugs. These transactions were designed, at least in part, to conceal the nature, location, source, ownership, and control of the proceeds. The defendant and

# Exhibit C

other members of the conspiracy profited through commissions based on the amount of money involved in each financial transaction. These commissions came directly and indirectly from the DTOs for whom they laundered money.

18.    Members of the conspiracy traveled to various locations throughout the United States, including the Eastern District of Virginia, to collect and cause the collection of proceeds derived from drug trafficking.

19.    Conspirators, both known and unknown, controlled or had access to accounts with Chinese financial institutions, including the Agricultural Bank of China, the Industrial and Commercial Bank of China, China CITIC Bank International, China Merchants Bank, China Construction Bank, Bank of China, and the People's Bank of China. The co-conspirators used these financial accounts in furtherance of their conspiracy, including to receive and transact proceeds derived from and associated with illicit drug sales in the United States.

20.    This Affidavit does not contain every fact known to me or the government regarding this investigation, but rather contains only information necessary to demonstrate probable cause in support of a criminal complaint and arrest warrant. All information contained in this Affidavit is either personally known to me, has been related to me by other law enforcement officers, or has been related to me by reports, records, and documents gathered during this investigation.

## **RELEVANT STATUTES**

21.    Under 18 U.S.C. § 1956(h), it is unlawful for any person to conspire to commit any offense defined in § 1956 or 1957. A violation of § 1956(h) is subject to the same penalties as the offense which was the object of the conspiracy.

# Exhibit C

22.     Under 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful for any person, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, to conduct, or attempt to conduct, such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

23.     Under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D), the manufacture, sale, or distribution of controlled substances constitute "specified unlawful activity" for purposes of § 1956.

## SUMMARY OF PROBABLE CAUSE

### *Background*

24.     Beginning in approximately January 2017, agents began investigating the leadership elements of Mexican DTOs and their money laundering networks. In addition to the seizure of over four (4) metric tons of cocaine in this investigation, the investigation has resulted in the conviction of multiple individuals for felony drug trafficking and/or money laundering offenses. Additionally, law enforcement has seized millions of dollars of drug proceeds nationwide.

25.     This investigation uncovered a money laundering organization ("MLO") led by individuals who laundered hundreds of millions of dollars for Mexican drug cartels. This MLO was responsible for laundering drug proceeds related to the importation of illegal narcotics into the United States, primarily from Colombia and Guatemala via Mexico.

26.     Members of this MLO operate worldwide, including in China, Hong Kong, Colombia, Panama, Mexico, Guatemala, Belize, Australia, New Zealand, Costa Rica, Ecuador, the United States, and elsewhere. The money laundering scheme extends across multiple countries

10

Exhibit C

and continents and involves the laundering of drug proceeds in or through the United States, including in and through the Eastern District of Virginia.

27.     As set forth more fully below, **TAN** and his co-conspirators traveled to various locations throughout the United States, including the Eastern District of Virginia, to collect and cause the collection of proceeds derived from drug trafficking, including the trafficking of fentanyl. They further communicated and coordinated with co-conspirators abroad, including in China, to arrange for the laundering of these proceeds through a system of mirror transfers and trade-based money laundering. After initially identifying other members of this money laundering network, investigators identified **TAN** as a suspected money launderer operating in states across the country. The government's investigation of **TAN** eventually led to a traffic stop in which over $200,000 in drug proceeds were seized from him along with numerous electronic devices containing additional evidence of money laundering.

### *Identification of CC-1*

28.     As part of this ongoing investigation, the government recruited a confidential source ("CS-1"). At law enforcement direction, CS-1 has represented him/herself to co-conspirators as a U.S.-based money launderer with significant connections to Mexican DTOs.[1]

29.     CS-1 identified an unindicted co-conspirator ("CC-1") as a major international money launderer and drug trafficker based out of mainland China. Through a series of consensually monitored phone calls, text messages, and meetings, CS-1, at the direction of law

---

[1] CS-1 was indicted, arrested, and pleaded guilty because of this investigation. CS-1 has cooperated extensively with the government. CS-1 was sentenced to 120 months in federal prison. As part of CS-1's guilty plea, CS-1 agreed to cooperate. The court ultimately reduced CS-1's sentence pursuant to a government motion under Fed. R. Crim. P. 35. CS-1's information has been corroborated by information provided by multiple additional cooperating defendants, bank records, naturalization documents, and electronic communications, among other means. CS-1 is a DEA confidential source and continues to cooperate with law enforcement in exchange for compensation and immigration benefits. Based on the foregoing, I submit that CS-1 is reliable.

# Exhibit C

enforcement, engaged in discussions with CC-1 regarding potential laundering of drug proceeds in the United States. Further, at law enforcement direction, CS-1 has openly discussed drug trafficking with CC-1, including distribution and importation of fentanyl and fentanyl precursors, cocaine, and heroin.[2]

### *November 2023 Controlled Money Laundering Operation*

30.      On or about October 24, 2023, CS-1 spoke with CC-1 via a recorded phone call and requested that CC-1 send a courier to the Northern Virginia area to pick up proceeds from the sale of "merchandise." In my training and experience with investigating this organization, I know that "merchandise" is a code word for illicit narcotics. In my training and experience, drug traffickers commonly use such code words in hopes of avoiding detection by law enforcement and concealing their illicit activities.

31.      On or about October 30 and 31, 2023, CS-1 again spoke with CC-1 via recorded phone calls in which CC-1 informed CS-1 that CC-1 could launder funds for approximately a 7% fee. CC-1 further stated that CC-1 would arrange for a courier to meet in Virginia to pick up the illicit proceeds so that CC-1 could then launder the proceeds and return "clean" funds to CS-1 within approximately twenty-four (24) hours.

32.      On or about November 7, 2023, CC-1 informed CS-1 in a recorded phone call that CC-1 would provide CS-1 with the telephone number for CC-1's U.S.-based money courier approximately two (2) to three (3) days prior to the money pick-up.

33.      On or about November 10, 2023, CC-1 provided CS-1 with WhatsApp phone number ▓▓▓▓▓-7489 ("DISPATCHER PHONE 1") as the contact number for CC-1's money

---

[2] The communications between CC-1 and CS-1 were largely conducted in a Chinese dialect. Most calls were recorded and are being translated. The information contained in this Affidavit regarding the substance of these calls is based on either draft translations of the recorded calls and/or information provided by CS-1.

# Exhibit C

laundering dispatcher. CC-1 also provided the serial number from a suspected U.S. currency note, which served as a passcode for the two parties exchanging the bulk U.S. currency in Virginia, Virginia. This is a common technique (often referred to as the currency verification technique) used by the members of this organization.

34.     Subsequent interception of Internet Protocol ("IP") data via a court-authorized WhatsApp pen register showed DISPATCHER PHONE 1 in the Chicago metropolitan area. Prior to providing CS-1 with this telephone number, CC-1 exchanged multiple messages with Chicago-area telephone number ███████-2495 ("x2495"), a telephone number subsequently identified as being used by a co-conspirator, Chaojie CHEN,[3] as described below in Paragraph 41.

35.     On or about November 15, 2023, in Arlington, Virginia, agents successfully introduced an undercover agent to CC-1's money courier and delivered $100,000 to the courier. Agents surveilled the courier, who drove back to Brooklyn, New York. CC-1 subsequently had an equivalent amount, less CC-1's commission, transmitted to a law enforcement-controlled cryptocurrency account.

### *January 2024 Traffic Stop of CHEN*

36.     CS-1 continued communication with CC-1 and arranged a second pickup of funds represented to be drug proceeds to occur on or about January 16, 2024. On or about January 10, 2024, CC-1 provided CS-1 with a second Chicago-area telephone number, ███████-1309 ("DISPATCHER PHONE 2"), to arrange this pickup and provided the name "Jay" for the individual who would coordinate the pickup. Immediately surrounding and prior to CC-1's communications with CS-1, CC-1 communicated with x2495.

---

[3] On or about April 18, 2024, CHEN was arrested in Chicago based on a Criminal Complaint authorized in 1:24-mj-153 charging him with violations of 18 U.S.C. § 1956(h).

13

Exhibit C

37.     On or about January 12, 2024, Honorable Judge Angela Petrone of the Circuit Court of Cook County, Illinois, signed an affidavit and application for historical cell tower information, prospective GPS location information, and the use of a cell site simulator on the x2495 telephone number. Following this, beginning on or about January 13, 2024, investigators began receiving location information on x2495, which revealed it was in/near the southside of Chicago.

38.     On or about January 15, 2024, agents observed that x2495 began to travel eastward from the Chicago metropolitan area. The device ultimately traveled to northern New Jersey (near the Staten Island, New York area), where it remained for approximately eight (8) to nine (9) hours. Following this, on or about January 16, 2024, the device began to travel westward, back toward the Chicago area.

39.     In an effort to identify the user of x2495, law enforcement coordinated with federal and state law enforcement partners in Ohio, including the Ohio State Highway Patrol ("OSHP"). OSHP troopers ultimately located a white Lexus SUV bearing Illinois license plates traveling westbound on the Ohio Turnpike. This vehicle was registered to CHEN at an address in Chicago.

40.     On or about January 16, 2024, OSHP troopers conducted a traffic stop on this vehicle for multiple traffic violations. Based on his State of Illinois Driver's License, the driver and sole occupant of the vehicle was identified as CHEN. The troopers subsequently conducted an open-air sniff of the vehicle using a K-9, resulting in a positive alert to the odor of narcotics. As a result of the positive alert, OSHP troopers conducted a search of the vehicle. No contraband was located.

41.     During the traffic stop, the location information of x2495 placed the device multiple times in the immediate vicinity of the traffic stop. Following the traffic stop, agents monitored the location information of x2495 and through physical and electronic surveillance followed CHEN

# Exhibit C

as he returned to a residence in Chicago. Based on the foregoing, I submit there is probable cause to believe that CHEN was the user of x2495.

42.     CC-1 later contacted CS-1 and informed CS-1 that CC-1's U.S-based coordinator for the planned January 16, 2024, money pickup had been stopped by law enforcement. CC-1 further stated that, at the time of the traffic stop, this individual had been returning from dropping off approximately $70,000 in bulk cash for CC-1. Further, CC-1 explained that these funds ($70,000) were dropped off at a location along with an additional $90,000 that had been smuggled from Atlanta by an additional courier working for CC-1's network. CC-1 stated that because this individual had been stopped after dropping off the cash, law enforcement did not locate any cash inside the individual's vehicle. Finally, CC-1 stated that this individual was now concerned that law enforcement, specifically DEA, had arranged for the traffic stop in order to identify the driver of the vehicle so the driver could be arrested at a later date. Based on the foregoing, I believe there is probable cause to believe that CC-1 was referring to CHEN.

43.     After identifying CHEN, investigators coordinated with law enforcement partners in the Detroit, Michigan, and Chicago, Illinois, areas and learned that CHEN had previously been encountered by law enforcement.

*April 2019 Seizure of $200,320 from CHEN in Detroit, Michigan*

44.     On or about April 3, 2019, troopers with the Michigan State Police conducted a traffic stop on a vehicle being driven by CHEN. During this traffic stop, just like the January 16, 2024, traffic stop, troopers deployed a K-9 unit which positively alerted to the odor of narcotics emanating from the vehicle. CHEN consented to the search of the vehicle and troopers discovered $200,320 concealed in several bags within a suitcase.

# Exhibit C

45.     Following the discovery of the bulk cash, CHEN waived his *Miranda* rights and agreed to speak with investigators with the assistance of an interpreter. In this interview, CHEN denied ownership of the bulk cash discovered in his vehicle, stating that he had met with an unknown male in Detroit earlier that day who had given him the cash. When asked why this unknown male had handed him bulk cash, CHEN stated that his "friend" had asked him to pick up the cash and that it was for cellphones. CHEN did not know the name of his "friend" and stated that they communicated via the encrypted communication application, "WeChat," which has been used by numerous members of this organization to communicate regarding money laundering activities. Following this interview, CHEN was issued seizure paperwork for the currency and released.

### *April 2020 Arrest of CHEN and Seizure of $149,680 in Chicago, Illinois*

46.     On or about April 27, 2020, investigators performed an investigative traffic stop on a vehicle in which CHEN was a passenger after observing CHEN meet in a parking lot with an individual. During the stop, investigators observed a gray bag on the floor behind the driver's seat. When asked about the bag, CHEN claimed ownership and stated that it contained "U.S. currency" for his family in China.

47.     During the traffic stop, investigators deployed a trained K-9 and, just like the April 2019 and January 2024 K-9 units, the K-9 unit alerted to the odor of narcotics from the vehicle. CHEN was then arrested and transported to the Chicago Police Department for an interview. A photograph of the funds seized during this traffic stop is depicted below:

16

# Exhibit C



*Photograph of Funds Seized from CHEN in April 2020*

48.     In a post-*Miranda* interview conducted with the assistance of an interpreter, CHEN stated that he worked for a Hong Kong-based company operated by an individual he identified as "Liu." According to CHEN, "Liu" paid him $7,000 per month to deliver electronic products to "customers" in the Chicago area in exchange for bulk cash. CHEN stated that after receiving the bulk cash from these "customers," he would then deliver the cash to various people at various addresses in the Chicago area, minus his monthly payment.

49.     Additionally, CHEN provided investigators with consent to search two (2) cellphones that were recovered during the traffic stop. Contained in one of these devices was a text message in which CHEN stated, "Please send your code." When asked about the message, CHEN stated that, prior to conducting cash-for-electronics exchanges, "Liu" would send him a "code" which CHEN would then provide to the "customers" to confirm their identities. Further investigation revealed that these "codes" represent the serial numbers on U.S. currency notes which, as noted above, is a common tactic used by money laundering organizations.

# Exhibit C

50. One of CHEN's cellphones also contained a WeChat contact listed as **"Peter (Ali WG 亚立美东)"** which is associated with phone number ▇▇▇▇-3588 ("x3588"). As described further below, the subscriber of x3588 is **TAN's** wife and the suspected user is **TAN**.

51. When asked by investigators if he responds to any nicknames or aliases, CHEN admitted that he answered to the nickname "Jay," the same name provided by CC-1 to CS-1 as CC-1's U.S.-based coordinator for the planned January 2024 controlled money laundering operation.

52. CHEN also provided investigators with consent to search several properties at which he resided. These searches discovered, among other things, ledgers, receipts, over two hundred fifty (250) Apple gift cards, vacuum seal bags, a vacuum sealer, a money counting machine, and rubber bands. All these items, in my training and experience, are indicia of illegal activity. Photographs of some of these items are depicted below:



*Rubber Bands, Vacuum Sealed Bags & Money Counting Machine in CHEN's Residence*

# Exhibit C



*Money Counting Machine Found in CHEN's Residence*



*Rubber Bands & Ledger Found in CHEN's Residence*

53.     Analysis of the ledgers discovered in CHEN's residence appear to reflect money

received by CHEN and then apportioned out to various co-conspirators, including **TAN**. Many of

# Exhibit C

the recorded transactions were catalogued by what appear to be U.S. currency serial numbers. Analysis of the transactions is ongoing but thus far investigators have identified recorded transactions totaling at least $10,412,385 with many transactions corresponding to a specific date and U.S. currency serial number. A photograph of one of the ledgers located in CHEN's residence documenting transfers to co-conspirators, including **"Peter,"** a known alias for **TAN** as described in Paragraph 50, is depicted below:



*Photograph of Ledger Found in CHEN's Residence*

***March 2024 Traffic Stop of TAN and Seizure of $197,770 in South Carolina***

54. As stated above in Paragraph 50, during the review of CHEN's electronic devices, investigators discovered that CHEN had saved phone number ████████-3588 ("x3588") under the contact name **"Peter (Ali WG)."** Analysis of call data provided to investigators pursuant to pen

# Exhibit C

registers authorized in the Eastern District of Virginia revealed that x3588 frequently traveled throughout the country, including to the Tulsa, Oklahoma, area and was in contact with numerous phone numbers associated with known and/or suspected money launderers.

55. On February 19, 2024, the Honorable Melissa East, Special Judge of the Tulsa County, Oklahoma, District Court, authorized the search and seizure of historical cell tower information, prospective GPS location information, and the use of a cell site simulator on phone number x3588.

56. Investigators' review of the historical cell tower information revealed that, from December 31, 2023, to February 19, 2024, x3588 had traveled throughout the United States, including to Florida, Georgia, North Carolina, and South Carolina. The below image depicts the device's movements during this timeframe:



*Historical GPS Location Information for x3588 from December 31, 2023, to February 19, 2024*

# Exhibit C

57.     A review of the prospective GPS location revealed that, from February 19, 2024, to March 2, 2024, x3588 had traveled to the Pittsburgh area, as well as Houston, Texas. A map depicting this location data is depicted below:



*Prospective GPS Location Information for x3588 from February 19, 2024, to March 2, 2024*

58.     On or about March 2, 2024, investigators continued to monitor the prospective GPS location information for x3588 and observed the device travel from Georgia, where **TAN** resides, to Pittsburgh, Pennsylvania, where it remained for approximately seven (7) to eight (8) hours. The device then returned south, heading through Virginia and on to North Carolina.

59.     On or about March 3, 2024, as the device continued to travel south through South Carolina, investigators contacted deputies with the Anderson County, South Carolina, Sheriff's Office regarding possible money laundering involving the user of x3588.

60.     Anderson County Sheriff's deputies then located a 2021 Toyota SUV bearing Georgia license plates traveling southbound through South Carolina. After locating the vehicle, the deputies conducted a traffic stop and identified **TAN** as the driver and sole occupant of the vehicle. During the traffic stop, the location information of x3588 placed the device multiple times in the immediate vicinity of the traffic stop.

22

# Exhibit C

61.     Upon questioning, **TAN** stated that he had been traveling from Charlotte, North Carolina. **TAN** denied consent for the deputies to search his vehicle. Deputies then deployed a K-9 unit which, just like the K-9 units deployed near vehicles driven by **TAN's** co-conspirator CHEN, resulted in a positive alert for the odor of narcotics. **TAN** then admitted to the deputies that he had cash in the vehicle. Based on the positive alert by the K-9 unit and **TAN's** self-admission, the deputies searched the vehicle and located $197,770 in bulk U.S. currency in the rear seat as well as two (2) cellphones and a laptop. A photograph of the currency located in the vehicle is below:



*Photograph of Funds Seized from **TAN's** Vehicle*

62.     Following the discovery of the funds, **TAN** agreed to waive his *Miranda* rights and speak with the deputies. **TAN** explained that he had traveled to Pittsburgh to pick up currency but that the pickup was ultimately canceled so he drove back to Georgia. While en-route to Georgia, **TAN** stated that he was asked to pick up bulk currency in Charlotte. **TAN** further stated that he regularly transported money and that the money did not belong to him.

# Exhibit C

63.     During **TAN's** interview, he provided consent to search the devices recovered from his vehicle during the traffic stop. On one of the devices, a deputy located a WhatsApp message conversation between **TAN** and an unindicted co-conspirator ("UCC-2") on or about March 3, 2024, in which they coordinated a meeting in Charlotte.



*Photograph of **TAN's** Text Message Conversation with UCC-2*

64.     When asked about the messages, **TAN** explained that UCC-2 was the individual he had met with in Charlotte who had given him the currency seized during the traffic stop. Further, the GPS location data for x3588 on or about March 3, 2024, revealed that **TAN** was in the area of the address provided to UCC-2 in the above photograph. Following this interview, **TAN** was released.

### *UCC-2's Ties to Drug Trafficking*

65.     On or about February 29, 2024, in a separate federal investigation in Charlotte, investigators conducted an undercover purchase of approximately three (3) ounces of suspected fentanyl from UCC-2. To arrange the deal, an undercover law enforcement officer ("UC")

24

# Exhibit C

communicated over WhatsApp with a source of supply who was using a Mexican telephone number and arranged to purchase fentanyl. When the UC arrived at the pre-determined meeting location that day, the UC was told he/she would be meeting with a female in a Kia vehicle. After arriving, the UC observed a Kia vehicle being driven by UCC-2 and entered the front passenger seat of UCC-2's vehicle where the transaction occurred. During the transaction, the UC observed a black handgun between the driver's seat and the center console of the vehicle. The UC positively identified UCC-2 as the person he/she had met with. The suspected fentanyl purchased from UCC-2 has been submitted for laboratory analysis.

66. Further investigation revealed that UCC-2 had provided the same WhatsApp number that **TAN** identified as being used by the individual who dropped off the money seized from **TAN** during the traffic stop on several Western Union money transfers UCC-2 had made to another individual in Mexico. Further, the profile picture for the WhatsApp number appears to be UCC-2. Accordingly, I submit there is probable cause to believe that UCC-2 was the individual that **TAN** picked up the seized currency from.

*Review of TAN's Electronic Devices*

67. Review of the devices seized from **TAN** during the traffic stop discovered numerous conversations between **TAN** and co-conspirators regarding extensive money laundering activities. Further, analysis of one of those devices revealed that it was registered to phone number x3588.

68. For example, investigators located a text message conversation between **TAN** and another uncharged co-conspirator ("UCC-3") regarding the pickup of currency. On or about October 16, 2023, **TAN** and UCC-3 discussed picking up bulk currency in Virginia. Specifically, UCC-3 asked **TAN** about "the ones for Virginia" and, in response, **TAN** provided two apparent

# Exhibit C

U.S. currency serial numbers. UCC-3 and **TAN** also discussed money pickups in Baltimore, Maryland, and Delaware. In my training and experience, including my experience in this investigation and interviews with cooperating defendants involved in the laundering of bulk currency, I know that money launderers picking up bulk currency in northeastern states, such as Maryland or Delaware, from southeastern states, such as Georgia where **TAN** resides, often travel through the Eastern District of Virginia by using Interstate 95 to reach their destinations.

69.    **TAN's** devices also contained text messages between **TAN** and DISPATCHER PHONE 1 regarding money laundering. For example, the photograph depicted below shows a text message conversation between **TAN** and DISPATCHER PHONE 1 coordinating the suspected pickup of currency by **TAN** from a co-conspirator. Notably, the user of DISPATCHER PHONE 1 stated to **TAN** that "[t]he boss is looking for" a co-conspirator.



*Photograph of Text Message Conversation Between **TAN** and DISPATCHER PHONE 1*

# Exhibit C

70.     Investigators also located messages between **TAN** and DISPATCHER PHONE 2 (the same phone number used to coordinate the planned January 2024 money laundering operation with CC-1). DISPATCHER PHONE 2 was saved in **TAN's** devices as "J~" which matches the known alias "Jay" used by CHEN. In these messages, which were sent in January 2024, **TAN** and the user of DISPATCHER PHONE 2 frequently exchanged apparent U.S. currency serial numbers, provided the amounts of currency being exchanged, and coordinated where and when to meet to transfer currency. For example, on or about January 16, 2024, the user of DISPATCHER PHONE 2 and **TAN** had the following conversation:



*Photograph of Text Message Conversation Between **TAN** and DISPATCHER PHONE 2*

71.     Based on my training and experience and my experience investigating this particular money laundering organization, I believe that in the above-captioned text conversation, **TAN** and the user of DISPATCHER PHONE 2 were exchanging a U.S. currency serial number to

# Exhibit C

verify each other's involvement in the exchange of bulk currency and then physically met at a pre-arranged location to exchange currency.

72. Additionally, investigators located a text message conversation between **TAN**, UCC-3, and another unindicted co-conspirator ("UCC-4") that occurred on or about June 22, 2022. In this conversation, **TAN** (using the alias **"Benny"**) provided the information for multiple Chinese bank accounts to UCC-3 and UCC-4 along with specific transfer amounts of RMB currency for each account. Next to each of the accounts that **TAN** provided was CC-1's name in Chinese characters. Later in the same conversation, UCC-4 provided **TAN** and UCC-3 confirmation that funds were deposited into CC-1's accounts.

73. Notably, one of CC-1's accounts listed in the June 22, 2022, text conversation was previously identified in this investigation during the search of electronic devices seized from Xueyong WU a/k/a "Antonio." WU was charged in the Eastern District of Virginia and convicted of money laundering conspiracy in 1:20-cr-00015 and sentenced to 60 months' custody. In a device seized from WU during his arrest, investigators located evidence of money transfers between WU and CC-1 from February to May 2020, including five (5) transfers from WU to the same bank account for CC-1 that **TAN** provided in the June 22, 2022, text message conversation.

## *Connection to Specified Unlawful Activity*

74. Under 18 U.S.C. § 1956(a)(1)(B)(i), for **TAN's** activities described herein to be illegal, they must have been "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of proceeds of specified unlawful activity[.]"

75. Under 18 U.S.C. §§ 1956(c)(7) and 1961(1)(D), drug trafficking is one such specified unlawful activity.

28

# Exhibit C

76.     As discussed above in Paragraphs 63 through 65, **TAN** self-admitted to picking up the funds seized from him on or about March 2, 2024, from UCC-2 who had, only a few days prior, sold suspected fentanyl to an undercover agent. Based on my training and experience and the evidence developed during this investigation, I submit there is probable cause to believe that the funds that **TAN** picked up from UCC-2 were generated, at least in part, by the sale of illegal narcotics.

## <u>CONCLUSION</u>

77.     Based on the foregoing, I submit that probable cause exists to believe that from at least in or around 2019 to the present, in the Eastern District of Virginia and elsewhere, **TAN** conspired with others known and unknown to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h) (Conspiracy to Launder Monetary Instruments) and 1956(a)(1)(B)(i) (Concealment Money Laundering).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Peter W. Maher*

Peter W. Maher
Special Agent
Drug Enforcement Administration

Subscribed and sworn to by telephone in accordance with Fed. R. Crim. Proc. 4.1 on May 8, 2024.

*William E. Fitzpatrick*

Hon. William E. Fitzpatrick
United States Magistrate Judge